**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**ROCK HILL DIVISION**

| | | |
|---|---|---|
| MorningStar Fellowship Church, | ) | |
| | ) | Civil Action No.: 0:18-cv-03077-JMC |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| York County South Carolina, James E. | ) | |
| Baker, and Houston "Buddy" Motz; and | ) | |
| Michael Johnson, | ) | **ORDER AND OPINION** |
| | ) | |
| Defendants. | ) | |
| | ) | |

The matter before the court is Defendants York County, James Baker, and Houston Motz's (collectively, "Defendants") Motion to Dismiss (ECF No. 96) Plaintiff MorningStar Fellowship Church's ("MorningStar") Third-Amended Complaint (ECF No. 91). In their Motion, Defendants seek to dismiss MorningStar's three remaining federal claims: (1) the Religious Use and Institutionalized Persons Act of 2000 claim ("RLUIPA"), the 42 U.S.C. §§ 2000cc–2000-cc-5, (2) the 42 U.S.C. § 1983 claim against York County, South Carolina ("York County") and (3) the 42 U.S.C. § 1985 against York County.[1] For the reasons set out below, the court **GRANTS** Defendants' Motion to Dismiss (ECF No. 96).

---

[1] The court observes that MorningStar misinterpreted the court's previous Order (ECF No. 84), whereby the court granted MorningStar's Motion for Leave to File its Third-Amended Complaint. MorningStar seems to have understood the ruling as an indication that its added claims have survived a motion to dismiss because the court determined the claims were not futile under its Rule 15 analysis. MorningStar states, "thus, it would seem that the issue as to whether the Third-Amended Complaint states a claim under both §§ 1983 and 1985 claims against Councilman Johnson and York County **has already been litigated**. Yet, here comes the county again, seeking to litigate the same issue by this motion…" (ECF No. 98 at 3.) (Emphasis added). MorningStar misapprehends the difference between the standard in a Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) and the standard under Federal Rule of Civil Procedure 15, which governs whether a plaintiff's claim is futile in the context of amending the complaint.

## I. RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

MorningStar is "an evangelical church operating primarily in Fort Mill, York County, South Carolina." (ECF No. 1 at 1 ¶ 1.) It describes itself as a "large . . . international ministry that reaches virtually every nation," including by publishing books that have been bestsellers and translated into over fifty (50) languages and hosting an internet television network and Christian conferences on its properties in Fort Mill. (*Id.* at 3 ¶¶ 12–14.) Those properties were once owned and operated by the large evangelical ministry known as the PTL, formerly headed by Jim and Tammy Faye Bakker. (*Id.* at 3 ¶ 15.) MorningStar purchased the properties in 2004. (*Id.* at 4 ¶ 19.) One of these properties, which is the subject of this lawsuit, is the Heritage Tower ("Tower"), a twenty-one story, partially-completed building consisting of five hundred (500) plus residential rooms. (*Id.* at 6 ¶ 25.) In 1989, Jim Bakker was convicted for overselling memberships to the Tower. (*Id.* at 7 ¶ 28.) *See also United States v. Bakker*, 925 F.2d 728 (4th Cir. 1991). MorningStar alleges the *Bakker* case "is relevant because [MorningStar] became the subject of anti-religious and anti-Christian comments by County officials, with at least one public official, namely . . . Motz, attempting to falsely suggest that the PTL and MorningStar are one in the same." (*Id.* at 7 ¶ 33.) Since purchasing the PTL properties in 2004, MorningStar renovated one building at a time, obtaining construction permits as needed. (*Id.* at 21 ¶ 81.)

When MorningStar was ready to begin renovation of the Tower, the County "mandated a 'Development Agreement,'" pursuant to the South Carolina Local Government Development Agreement Act ("SCLGDAA"). (ECF No. 1 at 21 ¶ 82, 22 ¶ 87.) On November 5, 2007, the County passed two ordinances regarding the Development Agreement with MorningStar, and on January 13, 2008, MorningStar and the County entered into a Development Agreement ("Agreement") with a five-year term. (*Id.* at 22 ¶ 86; 23 ¶ 93.) The Agreement provided for demolition of the

Tower if certain conditions were not met by MorningStar:

> [w]ithin 180 days of County approval of the commercial site plan for the Property, should [MorningStar] or its contractor be unable to obtain bid, performance and payment bonds from an A+ Best rated insurer or letters of credit from a national bank or substantial equivalent acceptable to County, then this Development Agreement shall be deemed null and void. At such time, the Tower shall be demolished, with all costs for its demolition borne by [MorningStar].

(ECF No. 1-2 at 5.)

On January 24, 2013, MorningStar brought an action against York County in the York County Court of Common Pleas, seeking declaratory judgment regarding "the County's apparently arbitrary actions under the . . . Agreement, by its use of a so-called 'default' mechanism to actively prevent MorningStar from getting bonding that was needed to complete [its] obligations under the [A]greement." (ECF No. 1 at 47 ¶¶ 198–99.) The County counterclaimed, seeking destruction of the Tower pursuant to the Agreement's demolition clause. (*Id.* at 48 ¶¶ 200–01.) York County filed its counterclaim on March 25, 2013. (*Id.* at 50 ¶ 210.) During discovery of that suit, MorningStar found evidence, which showed, in MorningStar's view, "the County's true intentions with regard to the church, revealing the County's unconstitutional discriminatory attitude against [MorningStar] in its exercise of religious activities." (*Id.* at 51 ¶ 213.) Specifically, MorningStar discovered two emails from 2010, which MorningStar described as "slanderous" and "defamatory." (*Id.* at 51 ¶¶ 214– 15.)

On November 14, 2018, MorningStar filed its original Complaint with this court asserting, *inter alia*, that Defendants denied building permits to MorningStar without a compelling state interest, therefore, interfering with Morningstar's stated mode of worship and its right to worship. (ECF No. 1 at 48-49 ¶ 201-05.) To that end, MorningStar alleged the following causes of action: (1) "violation of the free exercise clause of the First Amendment of the United States Constitution as to all Defendants" (*Id.* at 78–79 ¶¶ 331–35); (2) an "equal protection clause violation . . . of the

United States Constitution as to all Defendants" (*Id.* at 79–81 ¶¶ 336–41); (3) a "due process clause [] violation of the [Fifth] and [Fourteenth] Amendments [of the] United States Constitution as to all Defendants" (*Id.* at 81–83 ¶¶ 342–47); (4) "violation of the South Carolina Religious Freedom Act" (*Id.* at 83 ¶¶ 348–49); (5) violations of 42 U.S.C. § 1983 as to Motz and Baker (*Id.* at 84 ¶¶ 350–51); (6) violations of 42 U.S.C. § 1985 as to Motz and Baker (*Id.* at 84–85 ¶¶ 352–53); (7) injunctive relief as to the County (*Id.* at 85–86 ¶¶ 354–55); (8) violation of Article 1, Section 2 of the South Carolina Constitution (*Id.* at 86 ¶¶ 356–57); (9) violation of Article 8, Section 17 of the South Carolina Constitution (*Id.* at 86–87 ¶¶ 358–59); and (10) declaratory judgment under 28 U.S.C. § 2201 as to all Defendants (*Id.* at 87–93 ¶¶ 360–61).

For relief, MorningStar requests "a judgment on the merits of all the causes of action set forth above"; "a restraining order against [the] County to prevent it from continuing to apply a 'default' designation against MorningStar under the . . . Agreement . . . that expired on or about January 12[,] 2013"; "a permanent injunction . . . against [the] County preventing it from taking any action to destroy the . . . Tower"; "a trial by jury on any and all issues to w[hich] there may be a genuine question of fact"; "monetary damages . . . in an amount to be determined by a jury, for MorningStar's loss of use of [the] Tower as a result of the County's unconstitutional actions"; and attorney's fees and costs. (ECF No. 1 at 93–94.)

On January 11, 2019, Defendants filed a Motion to Dismiss MorningStar's original Complaint. (ECF No. 15.) On April 18, 2019, before the court had an opportunity to rule on Defendants' Motion to Dismiss, MorningStar filed its First Motion to Amend its Complaint, seeking leave of the court "to add a cause of action for violation of the federal Religious Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. §§ 2000cc–2000-cc-5." (ECF No. 28 at 1.) This was MorningStar's first time asserting its RLUIPA claim.

On June 17, 2019, the court partially granted Defendants' Motion to Dismiss the original Complaint (ECF No. 15), but also granted MorningStar's subsequently filed First Motion to Amend its Complaint. (ECF No. 34 at 1.) In its June 2019 ruling, the court dismissed "all of MorningStar's [original] federal claims" as untimely, which were its first, second, third, fifth, sixth, seventh, and tenth causes of action. (ECF No. 34 at 33.) However, the court also granted leave for MorningStar to file a First-Amended Complaint to add its RLUIPA claim, which MorningStar later added.

On May 8, 2020, this court granted MorningStar's Motion for Leave to file a Third-Amended Complaint and on May 15, 2020, MorningStar filed its Third-Amended Complaint. (ECF No. 91.) Defendants filed their Motion to Dismiss the Third-Amended Complaint on May 29, 2020. (ECF No. 96.) On June 26, 2020, MorningStar filed its Response to Defendants' Motion to Dismiss. (ECF No. 98). Defendants' Motion to Dismiss (ECF No. 96) is ripe for adjudication.

## II. LEGAL STANDARD

"A motion filed under Rule 12(b)(6) [of the Federal Rules of Civil Procedure] challenges the legal sufficiency of a complaint." *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009). "In considering a 12(b)(6) challenge to the sufficiency of a complaint, this Rule must be applied in conjunction with the liberal pleading standard set forth in Federal Rule of Civil Procedure 8(a)." *Jenkins v. Fed. Bureau of Prisons*, C/A No. 3:10-1968-CMC-JRM, 2011 WL 4482074, at *2 (D.S.C. Sept. 26, 2011). Rule 8(a) provides that to be legally sufficient, a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). When considering a motion to dismiss, the court should accept as true all well- pleaded allegations and should view the complaint in a light most favorable to the plaintiff. *Ostrzenski v. Seigel*, 177 F.3d 245, 251 (4th Cir. 1999). A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)

for failure to state a claim should not be granted unless it appears certain that the plaintiff can prove no set of facts that would support their claim and would entitle them to relief. *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* However, a federal district court may dismiss a claim as time-barred under Rule 12(b)(6) "if the time bar is apparent on the face of the complaint." *Dean v. Pilgrim's Pride Corp.*, 395 F.3d 471, 474 (4th Cir. 2005).

## III. DISCUSSION

Defendants contend they are entitled to dismissal of MorningStar's Eleventh Cause of Action (RLUIPA claim), as well as its newly asserted Twelfth (42 U.S.C. § 1983) and Thirteenth (42 U.S.C. § 1985) causes of action. As for MorningStar's RLUIPA claim, Defendants argue that it is time-barred. MorningStar further contends that the Complaint "fails to state any cognizable" claims against York County under §§ 1983 and 1985. (ECF No. 96-1 at 3.) The court will address each claim in turn.

A.  MorningStar's RLUPIA Claim

MorningStar's Eleventh cause of action is time-barred. The parties agree that the RLUIPA claim does not contain its own statute of limitations period, but that civil claims, such as RLUIPA claims, "arising under an Act of Congress enacted after [December 1, 1990]," have a four-year period of limitations. *See Jones v. R.R. Donnelley & Sons Co.,* 541 U.S. 369 (2004). The parties disagree on exactly *when* the statutes of limitations on MorningStar's RLUIPA claim began to run.

6

Defendants maintain that the claim accrued in 2008 when York County passed the 2007 ordinance that allegedly "caused a hardship that substantially affected the plaintiff's right of religious exercise" and deduces that the RLUIPA statute of limitations expired in May 2012. (ECF No. 58 at 7.) On the opposite spectrum, MorningStar asserts that the "initial triggering date of the RLUIPA statute of limitations claim" began on August 24, 2017, when York County denied its permit application to work on the Tower and asserts that the claim does not expire until "well into 2021." (ECF No. 63-1 at 20.)

Under federal law, RLUIPA claims "accrue"—that is, the statute of limitations begins to run—"when the plaintiff becomes aware of his or her injury," *United States v. Kubrick*, 444 U.S. 111, 123 (1979), or when he or she "is put on notice. . . to make a reasonable inquiry as to whether a claim exists." *Nasim v. Warden*, 64 F.3d 951, 955 (4th Cir. 1995). *See also Belanus v. Clark*, 796 F.3d 1021, 1025 (9th Cir. 2015) (claim accrues when plaintiff "knows or has reason to know of the injury that is the basis of the action"). For purposes of determining when a RLUIPA claim accrues, the Fourth Circuit has drawn a distinction between a "continuing violation" occasioned by "continual unlawful acts" and the "continuing ill effects from an original violation." *Nat'l Advert. Co. v. City of Raleigh*, 947 F.2d 1158, 1166-67 (4th Cir. 1991). The distinction matters because under the continuing violation doctrine, "when a harm has occurred more than once in a continuing series of acts or omissions, a plaintiff under certain circumstances may allege a 'continuing violation' for which the statute of limitations runs anew with each violation." *DePaola v. Clarke*, 884 F.3d 481, 486 (4th Cir. 2018). "In other words, if the plaintiff can show that the illegal act—here implementing an allegedly discriminatory ordinance— did not occur just once, but rather 'in a series of separate or 'discrete' acts[,] and if the same alleged violation was committed at the time of each act, then the limitations period begins anew with each violation.'" *A*

7

*Society Without A Name v. Virginia*, 655 F.3d 342, 348 (4th Cir. 2011) (alteration in original) (quoting *Nat'l Advert. Co.*, 947 F.2d at 1167). However, under the continuing ill effects framework "any continuing effects which are 'the delayed, but inevitable, consequences of the initial determination'" do not give life to a new limitations period. *Ngo v. Woodford*, 539 F.3d 1108, 1110 (9th Cir. 2008) (citing *Del. State Coll. v. Ricks*, 449 U.S. 250, 258 (1980)).

The parties inevitably dispute whether the allegations giving rise to the RLUIPA claim—specifically York County's August 24, 2017 permit denial—is a discrete and separate wrongful act or a "continued ill-effect" of the 2008 and 2010 violations which allegedly "caused a hardship that substantially affected the plaintiff's right of religious exercise." (ECF No. 58 at 7.) The court finds that two Fourth Circuit cases, *Nat'l Advert.* and *Miller v. King George Cnty.,* illustrate that the August 24, 2017 permit denial was a continuing ill effect of the initial 2008 and 2010 violations. 277 F. App'x 297 (4th Cir. 2008).

In *National Advertising*, the appellant's claimed harm was that a 1983 ordinance passed by the City of Raleigh, North Carolina, "restricted the use of its property without providing just compensation." *See* 947 F.2d at 1167. The Fourth Circuit held there was no continuing violation by the City of Raleigh:

> **[t]he restriction on use and the economic loss of which National complains occurred upon enactment of the ordinance**. No City action since then has added to National's alleged injury or otherwise constituted a taking. Seeking to avoid this conclusion, National points to a January 1989 letter from Raleigh, informing it that its nonconforming signs would have to be removed by April 1989, as a later wrongful act committed by the City within three years of National's suit. **This argument misses the mark. The letter was not a new wrongful act, but merely a reminder of the restriction placed on National's signs in 1983.** It caused National no additional injury, and is not itself the source of the alleged taking. The fact that National's signs ultimately were required to be removed or brought into conformity by April 1989 was one of the *effects* of their being deemed nonconforming upon enactment of the ordinance, not a separate violation.

*Id.* (Emphasis added).

8

To further distill, in *Miller*, applying the factors defined in *National Advertising*, the Fourth Circuit

found:

> there was no continuing violation [because] the harm to the Millers occurred
> when they were found in violation of the zoning ordinance in 2001. The additional
> "violations" cited by the Millers were merely the County's attempts to bring the
> Millers into compliance and were in large part caused by the Millers' refusal to
> comply with county and court orders. It was entirely foreseeable to the Millers that
> their continued failure to conform to the zoning requirements would result in civil
> and criminal penalties. Once they were cited for a zoning violation, the Millers were
> in a position to challenge the ordinance in state and federal court. In fact, if any
> unfairness could occur in this case, it would result from permitting the Millers to
> challenge the 2001 finding that they were in violation of zoning laws nearly six
> years after notice of the violation. Accordingly, we find that the continuing
> violation exception is inapplicable in this case.

*Miller*, 277 F. App'x at 299–300 (footnote omitted).

Similarly, to *National Advertising* and *Miller*, the County's August 24, 2017 denial of a

building permit to MorningStar was not a new wrongful act, but a consequence of the state litigation

commenced by MorningStar to challenge York County declaring MorningStar in default of the

Agreement, which is the harm alleged by MorningStar. (*See* ECF No. 1 at 48 ¶¶ 202–03 ("That

permit request was denied by the County, on or about August 24, 2017[,] using the excuse that the

matter was in litigation.")). Moreover, as an alternative basis, the court looks directly to

MorningStar's additional allegations to determine the statute of limitations period. *Robinson v.

Johnson*, 313 F.3d 128, 135 & n.3 (3d Cir. 2002) (a defendant may assert a statute of limitations

defense in a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) where it is apparent

on the face of the complaint that the claims are time-barred). MorningStar alleges, in several points

in its Complaint, that the County's denial of permits in 2017 is "another manifestation" of

discriminatory conduct that has "been in place and has remained in place since at least January of

2010." (ECF No. 53 at 113 ¶ 432.)

9

MorningStar also alleges:

> 369. The denial of [the 2017 permit], and of future permits is part of the implementation of, and extension of the anti-religious, illegally discriminatory public policy set into motion by the County, as manifested and put into place by the vile, hateful, and anti-religious words of its County Manager and former County Council in June, 2010.

(*Id*. at 110 ¶ 369.)

Accordingly, because MorningStar filed this action on November 14, 2018, which is more than four (4) years after 2008 and more than four (4) years after 2010, the RLUIPA claim is time-barred. Accordingly, the court **DISMISSES** MorningStar's RLUIPA claim, with prejudice. *See, e.g.*, *Mueller v. Bennett*, No. 3:18CV528, 2020 WL 1430430, at *5 (E.D. Va. Mar. 23, 2020) (RLUIPA claim untimely when statute of limitations period began at the time Plaintiff became aware of the alleged violation in December 2015 not when the "continual ill effects" of that violation later arose).

B. MorningStar's 42 U.S.C. § 1983 Claim

Next, the court will address Defendants' Motion as it pertains to MorningStar's newly added § 1983 claim. [2]  The claim is premised solely on an email that Councilman Johnson sent to his constituents on December 9, 2019, whereby he states the following:

> On November 20th the South Carolina Supreme Court dismissed the appeal of MorningStar Church as "improvidently granted." The Court's ruling did not alter a 2016 decision by Judge Daniel Hall which had previously dismissed MorningStar's breach of contract claim and damage claims. The lawsuit has been ongoing since 2013—the same year I joined Council.
>
> My hope is that this will allow us to bring this matter to a close. No matter which

---

[2] The court reminds MorningStar of its previous ruling dismissing MorningStar's §§ 1983 and 1985 claims against Defendants Baker and Motz. (ECF No. 34 at 21) ("because MorningStar filed this federal § 1983 action on November 14, 2018, which is more than three (3) years after its discovery of the emails by Defendants Baker and Motz, the court concludes all of MorningStar's causes of action under §§ 1983 and 1985 are untimely.")

side you are on, it is clear that this 6-year battle has only cost each side money. My hope is that cooler heads can now prevail and that a compromise can be had in which the tower is demolished. While the South Carolina Supreme Court has ruled on this aspect of the case, there are two other lawsuits—both filed by MorningStar—alleging religious discrimination (federal court) and a violation of the Freedom of Information Act (state court). I believe it is time for all of this litigation to end so both sides can move forward. If there is any movement, I will let you know.

(ECF No. 91 at 128.)

For relief, MorningStar requests:

. . .legal and equitable relief under 42 U.S.C. § 1983 including a declaratory judgment that it's [*sic*] Constitutional rights have been violated, and equitable relief by this court to preserve its constitutional right of freedom of worship, by ordering Defendant Johnson, and his fellow York County [Commissioner's] [*sic*] and York County bureaucrats, to withdraw the default that is in place against MorningStar, and to issue permits allowing the completion of its sacred tower.

(*Id*. at 121 ¶ 463.)

MorningStar alleges that York County should be held liable for Councilman Johnson's email, which it describes as "public comment" exhibiting "a slight departure from neutrality and against religion (in this case evangelical Christianity) or against a religious people or their practice (in this case the members and leadership of Plaintiff MorningStar Fellowship Church, and their stated desire to worship by completion of their Heritage Tower.)[.]" (ECF No. 91 at 118 ¶ 452.)

Defendants move to dismiss MorningStar's § 1983 claim on the ground that MorningStar fails to plead sufficient facts, which demonstrate any element of its claim, namely: (1) Defendant is vicariously liable under *respondeat superior* for current councilman Johnson's email to his constituents; (2) Councilman Johnson had final policymaking authority such that the language in his email attaches to York County; and (3) Defendants violated MorningStar's constitutional rights. (ECF No. 96-1.)  The court agrees.

11

42 U.S.C. § 1983 states in relevant part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured. . .

To state a § 1983 claim, a plaintiff must establish that it was "deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law." *American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40 (1999). However, "a municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell v. Dep't. of Soc. Serv.*, 436 U.S. 658, 691 (1978). (Emphasis in original). Rather, to state a § 1983 claim against a municipality for actions of an individual employee, as is the case here, a plaintiff must plead, *inter alia,* that the unconstitutional acts of its employees are attributable to a municipal policy or custom. *Id.* at 694 ("Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.").

As a threshold issue, and for clarity, the court observes that MorningStar and Defendants agree on one aspect of this quarrel. Specifically, Defendants are correct in that "there is no *respondeat superior* liability [against York County]. . . simply through its association with Mr. Johnson." (ECF No. 96-1 at 5.) And, therefore, "as a matter of law, York County cannot be held liable under 42 U.S.C. § 1983" solely due to that association. MorningStar agrees with this conclusion and states as much in its brief when it argues, "the County banks on the notion that *respondeat superior* is not automatically applied in 42 U.S.C § 1983 cases, to always bring in municipalities as defendants. **We don't disagree with that.**" (ECF No. 98 at 4.) (Emphasis added). Putting respondeat superior aside,

MorningStar continues, *"Monell* clearly allows a municipality or governing authority to be brought in as a defendant under § 1983 **if the agent embraces and/or advocates the governmental policy of the municipality, which is the case here**." (*Id.*) (Emphasis added).

Because the doctrines of vicarious liability and respondeat superior are generally not applicable in § 1983 actions, the issue for the court to resolve here is whether MorningStar's Complaint has sufficiently plead facts to establish that York County is liable for Councilman Johnson's email under the alternative theory available under *Monell*. It does not.

Under *Monell* and its progeny, while municipalities are not liable under respondeat superior principles for all constitutional violations of their employees simply because of the employment relationship, *Monell,* 436 U.S. at 692–94, municipal liability may result only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Id.* at 694. Of course, not every decision by every municipal official will subject a municipality to § 1983 liability. Rather, "municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986). Because § 1983 was not designed to impose municipal liability under the doctrine of respondeat superior, the "official policy" requirement was "intended to distinguish acts of the municipality from acts of employees of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." *Pembaur*, 475 U.S. at 479.

"While municipal 'policy' is found most obviously in municipal ordinances, regulations and the like which directly command or authorize constitutional violations (official pregnancy leave policy) it may also be found in formal or informal *ad hoc* 'policy' choices or decisions of municipal officials authorized to make and implement municipal policy." *Spell v. McDaniel*, 824 F.2d 1380,

1385 (4th Cir. 1987). The question of who possesses final policymaking authority is one of state law. *Pembaur*, 475 U.S. at 483. Moreover, "where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless causes an employee to do so, rigorous standards of culpability and causation must be applied to ensure the municipality is not held liable for the actions of its employees. *Bd. of the Cnty. Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 405 (1997).

Here, MorningStar has not alleged, nor does it claim to have alleged, the existence of a formal written policy, which Councilman Johnson would have allegedly executed when he disseminated the December 2019 email. Instead, MorningStar pursues the "ad hoc" approach and states, in its Response, that Councilman Johnson's email "was unquestionably 'pursuant' to [the] County Council Policy" of ensuring the Tower's destruction (ECF No. 98 at 6), because Councilman Johnson "is discussing a lawsuit against MorningStar authorized by the Council." (*Id.*)

While MorningStar is correct that a government policy or custom need not have received formal approval through the municipality's official decision-making channels to subject the municipality to liability, the court disagrees with its conclusion that the Complaint has alleged sufficient facts to support a claim under this alternative "ad hoc" theory of liability for two reasons.

First, MorningStar vigorously argues, in its response brief, that Councilman Johnson has final policymaking authority, however, does not allege, in its Complaint, any fact to that end.[3] Second, even if MorningStar had alleged this essential element in its Complaint, Councilman Johnson does

---

[3] Interestingly, MorningStar states, "the Third-Amended Complaint does in fact allege that Chairman Johnson's comments reflect an extension of official county policy against MorningStar for religious discrimination," yet MorningStar does not cite to its Complaint. *Alfieri v. Willys Motors, Inc.,* 227 F. Supp. 627, 630 (E.D. Pa. 1964) (Court did not entertain argument where "[p]laintiff raised the [issue] in his brief and at the time of argument but did not allege the same in his complaint.")

not have final policymaking authority as a matter of law.

Starting with the sufficiency of the Complaint as it pertains to Councilman Johnson and his email, MorningStar alleges the following:

438.    Defendant Chairman Johnson, as a public servant, and Chair of the York County Council, cannot act in a manner that passes judgment upon or presupposes the illegitimacy of MorningStar's religious beliefs and practices.

439.    Put bluntly, public comments cannot be made by public officials, sworn to uphold the Constitution and thus the Free Exercise Clause of the First Amendment, that slow even a slight departure from neutrality and against religion (in this case evangelical Christianity) or against a religious people or their practice (in this case the members and leadership of Plaintiff MorningStar Fellowship Church, and their stated desire to worship by completion of their Heritage Tower.)

(ECF No. 91 at 118 ¶¶ 451, 452.)

440.    Now, unfortunately, even after filing this federal lawsuit alleging religious discrimination, wherein *MorningStar has clearly stated, publicly, and without ambiguity, that it considers finalized construction and completion of its sacred tower to be an act of worship*[,] the new current Republican Chair of the York County Council, Michael Johnson, has apparently sent a mass email to constituents saying he "hopes" that the sacred tower, an instrument of MorningStar's worship, will be "demolished," and that he hopes "cooler heads" will prevail, clearly implying that MorningStar and its members, parishioners and pastors, as they seek only to worship, are not the ones with the "cool heads."

(*Id*. at 118–19 ¶ 453.)

441.    These statements, which cross the boundaries of religious neutrality demanded of public officials under the *Masterpiece Cakeshop* and the *Church of Lukumi* cases, was sent, upon information and belief, to Johnson's constituents, on or about December 9th, 2019, under which the Chairman seems to attempt to *partially* report on the results of a South Carolina Supreme Court appeal involving MorningStar and the County in a separate matter.

442.    But Chairman Johnson, nonetheless, even in recognizing MorningStar's religious discrimination claims, used the occasion as an opportunity to make public commentary, pitting himself and his own religiously prejudicial opinions against MorningStar out, in a public email, apparently designed to influence and coerce public opinion against MorningStar's stated hope for worship, and also to apparently influence and subtly coerce other County leaders and bureaucrats on matters that will prevent MorningStar from being able to carry out its stated desire to worship God by completing the Heritage Tower.

15

(ECF No. 91 at 119 ¶¶ 454-55.)

While MorningStar's Complaint mentions that Councilman Johnson is a public official, a public servant, and is the Chairman, the Complaint does not allege, explicitly or implicitly, that Councilman Johnson has final policymaking authority such that the Complaint alleges any fact beyond mere respondeat superior liability. *See, e.g. Doe 202a v. McGowan*, 2017 WL 8794896, at *6 (D.S.C. Nov. 13, 2017), *report and recommendation adopted*, No. 2:16-CV-00777-RMG, 2018 WL 919704 (D.S.C. Feb. 15, 2018) (§ 1983 claim dismissed when claim was based on email sent by city agent where plaintiff did not allege that agent held final policymaking authority nor did plaintiff sufficiently plead that city had an official policy or custom or an ad hoc policy or custom of unconstitutional retaliation).[4]

Second, even if MorningStar had sufficiently plead sufficient facts regarding Councilman Johnson's authority, the claim still fails as a matter of law. As the Fourth Circuit has interpreted, "the touchstone inquiry is whether 'the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered.'" *Hunter v. Town of Mocksville*, 897 F.3d 538 (4th Cir. 2018).  The question of who possesses final policymaking authority is one of state law. *Pembaur*, 475 U.S. at 483.

---

[4] Similarly, however, in a conclusory statement in response to Defendants' Motion to Dismiss, MorningStar states the "'official municipal policy' is crystal clear—the tower's destruction, as seen in the county's still active and ongoing state lawsuit, approved by County Council, and perpetuated by the current County Council." (ECF No. 98 at 6.)  However, MorningStar does not allege that there is an "ad hoc" policy of discrimination that is connected to Councilman Johnson's email. Instead the Complaint merely recites the alleged "no[n-]neutral" position Defendant Johnson allegedly took in expressing "that he 'hoped' that MorningStar's Tower will be 'demolished.'" (ECF No. 91 at 120 ¶¶ 456-59.) In failing to plead an adopted policy or custom pursuant to which Johnson acted, MorningStar's conclusory assertions are insufficient.

As indicated by South Carolina statute, "the responsibility for policy making and administration of county government shall be vested in the *county council*, which shall consist of *not less than three nor more than twelve members* who are qualified electors of the county." S.C. Code Ann. § 4-9-310 (West 2020) (Emphasis added). The court agrees with York County that one vote on any issue is not dispositive nor final—as such, Chairman Johnson's "vote [is] just one of the seven on the York County Council." (ECF No. 96-1 at 6.) Councilman Johnson has no unilateral authority to decide county policy on *any* issue. *See Bear Enters. v. Cnty. of Greenville*, 319 S.C. 137, 139 n.1 (S.C. Ct. App. 1995) ("[t]he governing body of a municipality acts as a collective body, not as individuals, and decisions made in this fashion are the product of debate and compromise."). Therefore, even if Councilman Johnson's December 9, 2019 email was intended to "have a chilling effect against the free exercise of religion," as MorningStar alleges, Councilman Johnson has no final decision-making authority, under state law, to hold York County liable for his email.

As further argument, unsupported in the Complaint, MorningStar contends that because Johnson is an "*ex-officio* member of . . . the Council Committee on Justice and Public Safety, which has jurisdiction over all County legal matters," "the court may in fact determine an implied discriminatory policy based upon the statements of a limited number of a governing council." (ECF No. 98 at 17–25.) Further, in MorningStar's Response, MorningStar directs the court to take notice of the South Carolina Association of Counties ("SCAC"), which the court interprets to mean its web domain and subdomains. (ECF No. 98 at 7–10.) Morningstar avers that the SCAC's *A Handbook for County Government in South Carolina* claims that "policy can be thought as 'values'" and therefore Johnson's email expresses the County's values.  (*Id.* at 10.)  The court acknowledges the SCAC's Handbook enumerates certain expectations for the Chairman, but the Handbook neither recounts law nor grants final policymaking authority. *See e.g. Carson v. Estate of Golz*, No. 17-CV-01152-RBJ-

17

MEH, 2018 WL 4090866, at *6 (D. Colo. Aug. 28, 2018) ("The...Handbook ...is not law." Rather, it is "intended for internal use for the information and guidance..." and "has no binding force."); *Cook v. Acme Markets, Inc.*, No. 14-CV-4958, 2015 WL 356962, at *3 (E.D. Pa. Jan. 26, 2015) (indicating that a mere policy is not law). But, even if it did, once more, MorningStar's Complaint lacks sufficient facts to allege that the handbook confers such policymaking authority upon Councilman Johnson. *Andasola v. Capital One Bank NA*, No. CV 12-02467-PHX-JAT, 2013 WL 1149663, at *4 (D. Ariz. Mar. 19, 2013) ("Because Plaintiff has not included [the] allegations in her Complaint" but instead in a Response, "Plaintiff has failed to state a claim upon which relief can be granted"). Accordingly, MorningStar's § 1983 claim fails both procedurally and substantively. Therefore, the court **DISMISSES** this claim.

C. <u>MorningStar's 42 U.S.C. § 1985 Claim</u>

The crux of MorningStar's § 1985 claim is that Councilman Johnson, Larry Harrison, Bea McCarter, Defendants Baker and Motz, and other unnamed co-conspirators, all "working as representatives of York County," conspired with one another in their official capacities to deprive Morningstar of its right to freely exercise its religion. (ECF No. 91 ¶ 468.) To state a claim under § 1985, a plaintiff must show: (1) a conspiracy; (2) an act in furtherance of the conspiracy; (3) an intent to deprive any person of the equal protection of, or equal privileges and immunities under, the law; and (4) a resulting injury to a legal right or privilege. *See Great Am. Fed. Savings & Loan Assoc. v. Novotny*, 442 U.S. 366, 373 (1979). To state a claim under Section 1985, therefore, a plaintiff much allege the existence of a conspiracy. Defendants argue that the § 1985 claim fails as a matter of law pursuant to the "intracorporate" conspiracy doctrine.

Under the intracorporate conspiracy doctrine, "a corporation [and municipality] cannot conspire with its employees, and, its employees, when acting in the scope of their employment, cannot

conspire among themselves." *McAndrew v. Lockheed Martin Corp.,* 206 F.3d 1031, 1036-37 (11th Cir. 2000); *see also Nelson Radio & Supply Co. v. Motorola, Inc.,* 200 F.2d 911, 914 (5th Cir. 1952) ("a corporation cannot conspire with itself any more than a private individual can, and it is the general rule that the acts of the agent are the acts of the corporation."); *Michelin v. Jenkins*, 704 F. Supp 1, 4 (D.D.C. 1989) (granting motion to dismiss § 1985 claim because District of Columbia Board of Education and its officers constituted a single entity); *Gladden v. Barry*, 558 F. Supp. 676, 679 (D.D.C. 1983) ("the weight of authority holds that there can be no conspiracy if the conduct complained of is essentially a single act by a single entity").

MorningStar has offered no argument or case law dispelling the notion that the intracorporate conspiracy doctrine applies in this scenario, and therefore has not alleged the existence of a conspiracy.[5] Indeed, Morningstar does not allege that any of the alleged co-conspirators "acted other than in the normal course of their corporate duties" for York County. *See Busci v. Kirven*, 775 F.2d at 1252 ("[W]hile authorized acts of the officials would constitute corporate action, (and hence would avoid a conspiracy charge), unauthorized acts would not."). Even accepting Morningstar's allegations as true, Morningstar's § 1985 claim is barred by the intracorporate-immunity doctrine. Accordingly, the Complaint fails to state a claim under 42 U.S.C. § 1985 and is **DISMISSED**.

D. Pendant State Law Claims

Finally, as all of MorningStar's federal claims have been dismissed, only the three (3) state law causes of action remain in MorningStar's Complaint: (1) the fourth cause of action, which alleges a violation of the South Carolina Religious Freedom Act, S.C. Code Ann § 1-32-10–60;

---

[5] The only arguably substantive mention of the § 1985 claim comes by way of MorningStar's assertion, "also alleged is the presence of a conspiracy, in fact a long-standing conspiracy which has manifested itself again and most recently in Chairman Johnson's unconstitutional and illegal comments." (ECF No. 98 at 6.)

(2) the eighth cause of action, which alleges a violation of Article I, Section 2 of the South Carolina Constitution; and (3) the ninth cause of action, which alleges violation of Article VIII, Section 17 of the South Carolina Constitution.  (ECF No. 91 at 84, 87-88 ¶¶ 352–53, 360–63.)

A federal district court "may decline to exercise supplemental jurisdiction ... if ... the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). A district court has broad discretion in deciding whether to dismiss, remand, or retain a case after relinquishing all federal claims in the case. *See, e.g.*, *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639-41 (2009); *Shanaghan v. Cahill*, 58 F.3d 106, 110 (4th Cir. 1995). In determining whether to retain, remand, or dismiss the state law claims, a district court should examine the "convenience and fairness to the parties, the existence of any underlying issues of federal policy, comity, and considerations of judicial economy." *Shanaghan*, 58 F.3d at 110 (citing *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988); *Growth Horizons, Inc. v. Del. Cty.*, 983 F.2d 1277, 1284 (3d Cir. 1993)). "There are *no* situations wherein a federal court *must* retain jurisdiction over a state law claim, which would not by itself support jurisdiction." *Shanaghan*, 58 F.3d at 110 (4th Cir. 1995) (alteration in original). *See also Carnegie-Mellon Univ.*, 484 U.S. at 350 n.7 ("[I]n the usual case in which all federal law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state []law claims.").

Here, all federal claims have been eliminated before trial at the motion to dismiss stage of litigation. There has been no discovery in this matter and the court finds no reason that MorningStar would be prejudiced by dismissing the pendant state law claims.  As no compelling basis has been brought forth for exercising supplemental jurisdiction over these claims, the court will dismiss them, therefore, dismissing all remaining claims against York County, Baker, and Motz. *Aschinger v.*

*Columbus Showcase Co.*, 934 F.2d 1402, 1412 (6th Cir. 1991) (given the "constitutional and prudential limits on the use of federal judicial power," the "balance of considerations" (considerations including judicial economy, convenience, fairness, and comity) for the district court should dismiss the state law claims in a federal question case in which no federal cause of action remains.").

## IV. CONCLUSION

MorningStar has failed to allege facts sufficient to establish a connection between the alleged federal violation (the violation of constitutional religious freedom based on an email from Councilman Johnson) and York County. The Complaint provides no facts on this score. While this court is obliged to view the Complaint (ECF No. 91) in a light most favorable to MorningStar, the requirement of liberal construction does not mean that the court can ignore a clear failure in the pleading to allege facts which set forth a claim currently cognizable in a federal court. *Wetter v. Dep't of Soc. Servs.*, 901 F.2d 387 (4th Cir. 1990). Upon a thorough review of MorningStar's Complaint (ECF No. 91), the court **GRANTS** Defendants' Motion to Dismiss MorningStar's Third-Amended Complaint (ECF No. 96). The case is **DISMISSED** without prejudice[6] as it relates to Defendants York County, James Baker, and Houston Motz. Because Defendants' Motion (ECF No. 96) does not address Defendant Councilman Johnson, individually, MorningStar's claims against that Defendant remain intact.

**IT IS SO ORDERED.**

*J. Michelle Childs*

United States District Judge

July 20, 2020
Columbia, South Carolina

---

[6] While the case is dismissed without prejudice, the RLUIPA claim is dismissed with prejudice as it is time barred and the defect cannot be cured.